UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:09-CR-233 |
| | ) | |
| DWAYNE SWIMS, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT, DWAYNE SWIMS' SUPPLEMENTAL SENTENCING MEMORANDUM

### Factual Background

The Defendant, Dwayne Swims, was sentenced on April 4, 2002 for aggravated unlawful use of a weapon and on August 16, 2002 for aggravated robbery in the State of Illinois. (Dkt. 107, Exhibit "A"). On October 4, 2006, he was discharged from Vienna Correctional Center in Illinois. Upon his discharge, he went to live with his sister, Brenda Swims, at 6232 South Claremont. (Sent. Tr. pp. 12-13). At some point, correspondence arrived from the Illinois Department of Corrections directed to the Defendant, Dwayne Swims. Upon receipt of that correspondence she opened it and read it to him over her house telephone. (Sent. Tr. p. 13). In recalling the contents of the letter, Brenda Swims stated: "it said that his restoration rights had been restored, he had been released from parole." She recalled Defendant's Exhibit 1 as being consistent with the correspondence that she read to Dwayne over the telephone. (Sent. Tr. p. 15). Even though she could not remember the dates or other pertinent information, she just remembers that she read it to him and that it restored certain rights to him. (Sent. Tr. p. 16). She further recalled that Exhibit 1 contained the same contents as the one she read over the phone.

(Sent. Tr. p. 16). To the best of her recollection, that was the last time she ever saw that correspondence. (Sent. Tr. p. 17).

The Defendant's recollection of the events corresponded to his sisters. He specifically recalled Brenda reading the contents of the letter to him over the telephone. (Sent. Tr. p. 22). At the time, he was in East Chicago, Indiana and he took the call by a house phone. (Sent. Tr. pp. 22-23). Brenda told him that he had some mail from the State of Illinois and he asked her to open it up and read it to him. (Sent. Tr. p. 23). He recalled that he received a letter practically the same month that he was discharged off parole. (Sent. Tr. p. 24). He remembers this because he would call his sister up occasionally and all of his mail was directed to his sister's house, as that is where he was discharged to on parole. (Sent. Tr. p. 24). Mr. Swims recollects that the letter came some point after he was discharged from parole, within a couple weeks or so. (Sent. Tr. p. 26). He further recalls that his sister read it to him word for word and that the contents of the correspondence tracked the language in Defendant's Exhibit 1. (Sent. Tr. p. 27).

Concerning the firearm at issue, all parties are in agreement that it is a .410 gauge shotgun. (Sent. Tr. p. 28). Mr. Swims admits giving differing stories to the arresting agent as to the gun's origination. (Sent. Tr. p. 29). The first story he told was that it belonged to his brother, and then he said it belonged to his wife or her side of the family. (Sent. Tr. p. 29). After being chastised that he should tell the truth, he then submitted to the agents and told them the truth. (Sent. Tr. p. 29). He recited that the gun was in his residence when he moved into the rental house, that he took it down, examined it, saw that it was old and thought it might be worth some money. (Sent. Tr. p. 29). Initially, it was in two (2) pieces. The end part or the barrel was separated from the butt. (Sent. Tr. p. 30). The Defendant was unfamiliar with the part of the shotgun called the "forearm", but stated there was no piece of wood underneath the metal barrel,

just the metal barrel itself. (Sent. Tr. p. 30). Initially, he did not even know if it was a shotgun or a rifle. Likewise, there was no ammunition present nor did he know what type of ammunition the gun took. (Sent. Tr. p. 30). After examining the gun, he went on the internet to try and sell it. (Sent. Tr. p. 31). Eventually, he took it to Westforth's in Gary, Indiana but was told there was nothing they could do with the gun. (Sent. Tr. pp. 31-32). At that point, he took it back home and put it back up where he found it and started going on Ebay to try and get rid of it. (Sent. Tr. p. 32).

At some point while he was residing at the residence, the prior tenants had come back trying to get access to the house for some unknown reason. (Sent. Tr. pp. 33-34). Eventually, he turned them away because he thought they were scaring his family. (Sent. Tr. p. 35). In point of fact, Mr. Swims never put the gun together because he did not know how to and thought it had a rod which kept it from being put together. (Sent. Tr. p. 35). He further believed that the ATF agents made the gun function because he thought the gun did not have a firing pin which would allow it to fire. (Sent. Tr. pp. 35-36).

## Legal Argument

A. **Seventh Circuit precedent relieves Swims from ACCA (§924(e)) punishment.**

As it pertains to 18 U.S.C. §922(g)(1), if one has had his civil rights restored for a particular conviction, that conviction will not count as a violent felony under §924(e) unless the restoration of those rights provides that the person may not ship, transport, possess, or receive firearms. 18 U.S.C §921(a)(20). Stated otherwise, if a convicted felon receives a document from his state of conviction restoring all of his civil rights, that conviction will not count for federal purposes unless the document warns of a lingering firearm disability. Buchmeier v. United States, 581 F.3d 561, 566 (7th Cir. 2009) (en banc). The burden is upon the Defendant to

show by a preponderance of the evidence that his rights have been restored. United States v. Foster, 652 F.3d 776, 793 (7th Cir. 2011). Although earlier cases have addressed the issue, the present controversy centers around Buchmeier v. United States, 581 F.3d 561 (7th Cir. 2009), and the 7th Circuit cases which were begat by that decision and which address the present issue. The correspondence received by the Defendant in Buchmeier from the Illinois Department of Corrections basically tracked the same language as Defendant's Exhibit 1 except for the following clause: "of your right to vote and". 581 F.3d at 564. The Buchmeier court refused to sway from its earlier holding in United States v. Erwin, 902 F.2d 510 (7th Cir. 1990) and determined that when a state sends a document stating that civil rights have been restored, then §921(a)(20) is invoked unless that document expressly provides that the person receiving the correspondence may not ship, transport, possess or receive firearms. Id. at 567. The Buchmeier court ultimately held that because the state sent the Defendant a document stating that his principal civil rights have been restored, and yet neglected to mention a firearms disability, his prior convictions could not count for federal purposes and resentencing was required. Id. Since Buchmeier, the 7th Circuit has decided two (2) cases which bear upon this Court's decision.

The first, is United States v. Burnett, 641 F.3d 894 (7th Cir. 2011). Of initial significance, the 7th Circuit determined that §921(a)(20) sets an objective standard. Id. at 896. The statute does not speak to what a person believes, but only what a document contains. Simply put, if the document says that civil rights have been restored but omits a firearm qualification, the conviction does not count as a violent felony. Id. That is to say, it is irrelevant whether the recipient either reads or understands the communication, only that the document was sent. Id. The 7th Circuit went on to hold that because the Defendant in Burnett only received - as an objective matter - a letter pertaining to one (1) of his convictions, that that letter must be limited

4

to that conviction alone which left Burnett with three (3) or more qualifying convictions subjecting him to a §924(e) sentence. Id. at 897.

With that being said, the Court went on to note, in *dicta* that Illinois changed its form letter in March of 2004 and that the new form did not tell an ex- prisoner that he enjoyed the right to vote, thus taking it outside of the scope of §921(a)(20). The Court went on to say that unless the communication says that both of those rights (vote and hold office) have been restored, omission of a firearms reservation will not cancel the conviction status as a violent felony. Id. at 897. The Court then speculated that the 2004 form's omission of any reference to voting must be why the Defendant did not challenge his domestic battery conviction as a violent felony. Id. Significantly, the Court also said that the 2004 version remains misleading because it does not distinguish types of offices and did not contain a firearms reservation nor say which convictions it covered. Id. at 898. Burnett's *dicta* is not controlling in the present case.

Approximately one (1) month after Burnett was decided, the 7th Circuit decided United States v. Foster, 652 F.3d 776 (7th Cir. 2011). Foster differs from Burnett in the following respects: while Burnett held that because only the right to vote and the right to hold public office can be restored or withheld, then the communication must restore those right(s); Foster holds that the right to vote is automatically reinstated when the sentence expires. See, Burnett, 641 F.3d at 897 and Foster, 652 F.3d at 793. Each opinion acknowledges that the right to serve on a jury is not a right of which Illinois deprives a felon. Id.

The import of this distinction was recognized in United States v. Logan, 453 F.3d 804 (7th Cir. 2006). There, the Defendant challenged certain prior convictions alleging that a conviction which does not result in the loss of the right to vote, hold public office and serve on a jury should be treated the same as a conviction following which those rights were lost but then

5

later reinstated. Id. at 805. There the 7th Circuit explained to "restore", necessarily means giving back something that has been taken away and that restoring something never lost or diminished is a definitional impossibility. Id., citing McGrath v. United States, 60 F.3d 1005 (7th Cir. 1995). This was further explained in United States v. Williams, 128 F.3d 1128 (7th Cir. 1997) where the 7th Circuit determined that a statute generally restoring civil rights of all prisoners is insufficient for purposes of §921(a)(20) if the state continues to withhold some rights from felons. Id. at 1134.

The significance of these distinctions are explained in United States v. Bost, 87 F.3d 1333, (D.C. Cir. 1996), which was cited with approval in Buchmeier. In Bost, the Defendant had received a certificate entitled "Restoration of Civil Rights" which reinstated his right to serve on a jury and to hold an office of honor. Id. at 1334. Specifically addressed was the right to vote which was restored by statute, and the Defendant's right to hold office and serve on a jury which were restored by certificate. Id. at 1337. Discussing this dichotomy the Court held:

> "it suffices that Bost has recovered all of them through a combination of sources that do not expressly restrict his rights with respect to firearms. Accordingly, we conclude that Bost is not subject to prosecution." Id. at 1337.

In the present case, Dwayne Swims has proved by a preponderance that he in fact received the correspondence at issue. The form correspondence was admitted without objection and there does not appear to be any real contention that the letter was never received. However, the Government has argued in prior briefing and intimated at argument that Burnett controlled the outcome of this case and that Mr. Swims is subjected to the enhanced penalty of §924(e) because the form letter that he received failed to include the term "right to vote". However, as the above-referenced authorities make clear, that the verbiage is superfluous. Illinois automatically restores a person's right to vote when his sentence expires. Foster, 652 F.3d at

793. The State of Illinois was not required to give back the right to vote, as it was automatically reinstated. Because Mr. Swims right to vote was automatically restored when his sentence expired, and because his right to serve on a jury was never suspended in the first place, the only right that needed to be restored was that of holding public office. In the present case, that right was restored without reservation or indictation that he could not ship, carry, possess or transport a firearm. That being the case, the Defendant does not have the necessary predicates to qualify as a Armed Career Criminal.

**B.    It Was Clearly Improbable That The Firearm In Question Was Connected With The Offense Of Conviction.**

The Court has also asked the parties to present final argument and briefing on the issue of whether or not an enhancement is appropriate under the Guidelines for the possession of a weapon which was connected to the offense in question. The parties agree that the 7th Circuit's decision in United States v. Corral, 324 F.3d 866 (7th Cir. 2003) sets the framework for such an analysis. The first step in the analysis is whether or not the gun was possessed by the Defendant. Because Mr. Swims has admitted to being a felon in possession of a firearm, it would be illogical for him to argue that he never possessed a weapon. Therefore, the burden then shifts to Mr. Swims to prove that it was clearly improbable that the firearm was possessed in connection with the instant offense. Id. at 872, citing United States v. Harris, 230 F.3d 1054, 1057 (7th Cir. 2000). Certain factors that the Court should examine is temporal proximity to the drug activity, as well as physical proximity. Id. at 873. In Corral, the apartment where the gun was found was a stash house used for illicit drug activity. Id. There was no other explanation for the presence of the gun in the apartment other than to utilize it in connection with drug activity that was taking place inside the apartment. Id. Because the Defendant did not point to any evidence to

contradict the strong presumption of connectivity, the Court determined that the firearm was possessed in conjunction with the offense. Id.

In the present case, there is an abundance of evidence to rebut the presumption. First, according to the Defendant, the gun was found in the kitchen pantry when he moved into the residence. As an aside, the fact that Mr. Swims told two (2) differing stories would not change the analysis. Regardless of the shotguns etiology, the nature of the firearm is unchanged. By that, the Defendant means to say that the gun was clearly an old shotgun with little or no value. When the gun was found by the agents, it was in two (2) pieces just as Mr. Swims described it. There was no ammunition anywhere in the house and Mr. Swims did not even know what type of ammunition it took. Further, he was of the belief that it had no firing pin and was not capable of being fired at any rate. The forearm of the shotgun was missing leaving nothing but a bare barrel. Each of the controlled buys in question took place outside of the residence and nowhere in proximity to the gun in question. Even more, the gun was in the pantry of a kitchen where Mr. Swims resided with his wife and her small children. This was a family residence and not a stash house as depicted in Corral. The sum total of all these various facts adds up to the conclusion that it was clearly improbable that the gun was possessed in relation to a drug crime. Therefore, an enhancement is not appropriate under the present circumstances.

Respectfully submitted,

DWAYNE SWIMS

By: /s/ R. Brian Woodward
R. Brian Woodward, #2303-45

Woodward, Buls, Blaskovich & King, LLP
9223 Broadway, Suite A
Merrillville, Indiana 46410
Phone: (219) 736-9990
Attorney for Defendant

## CERTIFICATE OF SERVICE

I certify that on April 18, 2012, a true and complete copy of the above and foregoing pleading or paper was made upon each of the parties and/or attorneys of record herein by CM/ECF.

/s/: R. Brian Woodward
R. Brian Woodward, #2303-45